310 Ga. 818
FINAL COPY

S20A1223.  HURSTON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Kelvin Hurston and his co-defendant Dextreion Shealey were convicted of felony murder and other crimes in connection with the gang-related shooting death of Daven Tucker. In this appeal, Appellant contends that the trial court violated his constitutional right to be present during his trial and that his trial counsel provided ineffective assistance by failing to request a ruling on his motion to sever his trial from Shealey's, failing to request a ruling on his motion to suppress evidence derived from a search warrant, failing to request a jury instruction on accomplice corroboration, and failing to request a proper limiting instruction on other acts evidence. All of these claims are meritless, so we affirm.[1]

---

[1] Tucker was killed on December 17, 2016. In March 2017, a Troup County grand jury indicted Appellant, Shealey, Charles Lovelace, Shawndarious Sands, Coty Green, Natori Lee, Dantavious Rutledge, Zachary Holloway, and Andre Gilliam for a series of allegedly gang-related crimes.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the evening of December 17, 2016, Appellant (who was then 16 years old and known as "K.J."), Shealey, Charles Lovelace, Shawndarious Sands, Coty Green, Natori Lee, Lee's brother Kouri, Dantavious Rutledge, Zachary Holloway, Andre Gilliam, and Essence Todd – all

---

Green, Lee, Rutledge, Holloway, and Gilliam pled guilty and later testified for the State. In April 2018, Appellant, Shealey, Lovelace, and Sands were reindicted, individually and as parties, for felony murder based on aggravated assault, aggravated assault, and participating in criminal street gang activity in connection with the fatal shooting of Tucker. Appellant was also indicted for aggravated assault and a gang-activity charge in connection with a shooting at a Troup County park earlier on the night of the murder, as well as one count of possession of a firearm during the commission of a felony in connection with each incident. Shealey, Lovelace, and Sands also were indicted on additional charges.

Lovelace and Sands then pled guilty, and Appellant and Shealey were tried together beginning on April 16, 2018. On April 23, the jury found Appellant guilty of all charges against him. (The jury found Shealey not guilty of one gang-activity count but guilty of the other charges against him; we affirmed his convictions in *Shealey v. State*, 308 Ga. 847 (843 SE2d 864) (2020).) The trial court sentenced Appellant to serve life in prison for felony murder, twenty consecutive years for the aggravated assault conviction related to the park shooting, twenty consecutive years for each of the gang-activity counts, and five consecutive years for each of the firearm counts; the remaining aggravated assault count merged. Appellant filed a timely motion for new trial, which he amended through new counsel in September 2019. After an evidentiary hearing, the trial court denied the motion in January 2020. Appellant filed a timely notice of appeal, and the case was docketed to this Court's August 2020 term and submitted for a decision on the briefs.

of whom were connected to a criminal street gang from West Point called "4way" – attended a memorial celebration for a friend who had died.[2] After the memorial, the group and a few other people decided to go to LaGrange. Appellant rode there in Todd's Hyundai Sonata, and the others drove in a caravan of cars that included Shealey's Ford Mustang and Green's Honda Accord. Appellant and a few others in the caravan stopped at a gas station in LaGrange before proceeding to a nearby public housing complex. A surveillance video recording of the complex's parking lot showed that Todd's Sonata and the other cars in the caravan were at the complex from 9:53 to 9:59 p.m.

According to Green, there was an ongoing "beef" between 4way and a LaGrange group called "Mob," and the people in the caravan decided to drive to Granger Park to see if any people associated with Mob were hanging out there. Surveillance video recordings from the

---

[2] The State presented testimony from Kouri (whose case was adjudicated in juvenile court) and an expert on gangs, along with photos and video recordings, to establish that 4way was a gang, that all of these individuals were members of or associated with the gang, and that Appellant was associated with the gang.

3

park showed that at 10:03 p.m., Todd's Sonata and the rest of the caravan of cars entered a parking lot where dozens of people had gathered. According to several witnesses who were in the park, gunshots rang out from some of the cars in the caravan. Todd saw Appellant, who was sitting in the back seat of her car, shoot into the parking lot. Holloway, who was also sitting in the back seat, saw Appellant use a big, black, MAC-style nine-millimeter gun to shoot. Another witness in the park heard return fire from some of the people in the parking lot.[3] The park surveillance video showed that the caravan left as people in the parking lot ran away. Investigators later found 39 shell casings in the parking lot, including 13 nine-millimeter shell casings. Remarkably, no one was injured during the shooting.

The surveillance video from the housing complex showed that at 10:07 p.m., Todd's Sonata and the rest of the caravan returned to the complex's parking lot. Shealey's Mustang had a bullet hole in

---

[3] Several people in the caravan testified that the people in the parking lot began shooting first.

the passenger door, and according to several members of the caravan, Shealey was angry because his car had been hit. Kouri received information that Mob members had shot at the caravan; he relayed that information to the group at the housing complex, and Green said that he knew the location of a house where some Mob members lived. Shealey suggested that they go to the house, which was on Newnan Street, saying, "Somebody's got to pay. My car just got shot," and "What y'all want to do? Somebody's got to get it." Green testified that he, Appellant, Shealey, Lovelace, Sands, Lee, and Kouri planned to "shoot . . . up" Daven Tucker's house – the house on Newnan Street – because Tucker was a member of Mob. Appellant rode in the Sonata with Sands, Rutledge, and Holloway, while Shealey, Green, Lovelace, Lee, and Kouri rode in Green's Accord.[4]

The Sonata and the Accord parked near Newnan Street, and Appellant, Green, Lovelace, and Sands got out of the cars. Green

---

[4] Gilliam, Todd, and other people in the caravan drove back to West Point.

testified that he had a .40-caliber gun; Appellant had a big, black MAC-11 handgun; Lovelace carried a nine-millimeter gun or a .380 pistol; and Sands carried a nine-millimeter gun.[5] Green testified that he, Appellant, Lovelace, and Sands started shooting toward the house. Green shot once and then got back in the Accord as the three other men continued to shoot. Green and Lee heard return gunfire from the direction of the house.[6] Appellant and Sands got back in the Sonata, and Lovelace got in the Accord. Rutledge and Holloway, who each remained in the Sonata during the shooting, testified that after Appellant got back into the car, he said that he had "performed," which Rutledge understood to mean that Appellant had fired his gun. Both cars then fled.

Tucker, who had been in the front yard of his house, was shot once in his chest. Emergency responders arrived minutes later, around 11:00 p.m., and took Tucker to a hospital, where he soon died

---

[5] Rutledge also testified that Appellant had a big, black MAC-11. Kouri testified that Appellant had a big, black MAC-9, and Lee testified that Appellant had a TEC-style gun that was "bigger than a pistol."

[6] Lee, Rutledge, Holloway, and Kouri, who had stayed in the cars along with Shealey, testified that they heard gunshots but did not see who shot.

from the gunshot wound. Investigators later found 34 nine-millimeter shell casings, five .380 shell casings, and one .40-caliber shell casing at the scene.

Appellant and the other eight 4way members and associates eventually went to a motel in Alabama. Rutledge testified that later that night, Appellant said, "I killed the n**ger." Green, Lovelace, and Kouri were arrested at the motel the next day.[7] In Green's Accord, investigators found Green's .40-caliber gun, an empty box for nine-millimeter bullets, a nine-millimeter bullet, and a plastic tray used to hold ammunition. Appellant's gun was never recovered.[8]

In February 2017, investigators interviewed Appellant's 14-year-old girlfriend Ashanti Daniel. The interview was video recorded, and the recording was later played for the jury. Daniel told

---

[7] Lee was arrested on December 20; Rutledge was arrested on December 22; Holloway was arrested about two months later. The record does not specify when Shealey and Sands were arrested.

[8] Several of the 4way members and associates testified that after the shooting, Appellant put his gun in Holloway's backpack. Holloway testified that he gave the gun back to Appellant, who then buried it. Kouri also testified that Appellant said that he buried the gun.

investigators that Appellant had said that he was involved in a shooting and that he "killed the dude." Appellant was arrested on February 24.

A few days before his trial began, during a recorded phone call that Appellant made from jail to two unidentified people, Appellant said that someone should "jump" Daniel. In addition, the State presented evidence that on the morning of the murder, Sands sent Appellant a Facebook message asking, "You got the Tec?" Appellant responded, "Yeah." Sands then asked about a pistol, and Appellant said that it had been traded. The State also presented evidence under OCGA § 24-4-404 (b) that about three months before the murder, Appellant sent Facebook messages to an unknown person, asking to borrow a gun to "shoot somebody['s] house up."

Appellant and Shealey did not testify. Appellant's theory of defense was that he was not a gang member, was not involved in the shootings, and was being set up by the 4way members who had taken plea deals.

Appellant does not challenge the legal sufficiency of the

evidence supporting his convictions. Nevertheless, in accordance with this Court's waning practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); *Shealey v. State*, 308 Ga. 847, 850 (843 SE2d 864) (2020) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).[9]

2. Appellant contends that his right under the Georgia Constitution to be present during all critical stages of the criminal proceedings against him was violated when he was excluded from a

---

[9] We remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

conference room meeting during which the trial court questioned Daniel about whether she would testify at trial. Because Appellant acquiesced to his absence from the meeting, this claim fails.

(a) When one prosecutor called Daniel to testify during the trial, the other prosecutor immediately asked the court if counsel could approach the bench. After a bench conference, which was not transcribed, the court asked the jury to leave the courtroom. The jury left; Appellant (and Shealey) remained. A prosecutor then said that Daniel was in the hallway outside the courtroom but refused to come in to testify because she was "scared." The prosecutor suggested that Daniel was unavailable to testify because she was intimidated by the jail call during which Appellant said that someone should "jump" her, and the prosecutor argued that the video recording of Daniel's interview with investigators should be admitted into evidence under OCGA § 24-8-804 (b) (5).[10] Appellant's

---

[10] OCGA § 24-8-804 (b) (5) says that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" shall not be excluded by the hearsay rule "if the declarant is unavailable as a witness."

trial counsel agreed that the recording of the interview should be admitted. The trial court said that it first needed to determine whether Daniel was unavailable, and that "we need to get her in here and get her on the stand and I need to ask her if she's going to testify." A prosecutor asked if the court could do that in chambers, and the court told the prosecutors to bring Daniel into a conference room. The prosecutor said that Daniel's mother should also come in to "testify to how scared [Daniel] is." The court replied, "All right," and told the lawyers and the court reporter to come into the conference room.

At the beginning of the conference room meeting, which was transcribed, the trial court said that it, the two prosecutors, Appellant's counsel, Shealey's counsel, Daniel, and Daniel's mother were present. The court confirmed that Daniel had received a subpoena and explained that it was a court order to testify and that the State wanted her to testify. The court said that the prosecutors indicated that she did not want to testify; Daniel responded, "Yes." The court explained that it could not make her testify but that it

could hold her in contempt if she refused and then asked if she would testify. Daniel said that she would. The court told her that the lawyers would ask her questions in the courtroom and asked if Daniel understood that the defendants, the jury, and other people would be there. Daniel said, "Yes." The court asked if she was willing to tell the truth, and Daniel responded, "Yes."

A prosecutor then noted that if Daniel testified that she did not remember certain events, the court would need to revisit the issue of whether she was available as a witness. After a brief discussion about how the lawyers might handle that issue, the court said that the parties could deal with it later if Daniel refused to testify. The judge and the lawyers then returned to the courtroom, where Appellant was present; the jury was brought in; and Daniel took the witness stand. Shortly after a prosecutor began questioning her, Daniel covered her face with her hands. The court reminded her that she was under subpoena, that "[w]e talked about that before," and that she could be held in contempt for refusing to testify. Daniel then

testified; her testimony turned out to be favorable for Appellant.[11]

Later, after the jury was excused for the day, the trial court asked the lawyers if there was "anything we need to put on the record," and a prosecutor responded, "You know, we took the one potential witness back." The court said, "Yeah, and the defendants weren't back there for that," explaining that the court did not include the defendants in the meeting because there was an implication that "there was some kind of threat." The prosecutor said to the defense lawyers, "I'm sure that was done with the knowledge of each of your clients," and the court said, "I mean, counsel was back there and nobody objected." Shealey's counsel replied, "Absolutely. We have no issue with that"; Appellant's counsel did not separately respond.

At the hearing on Appellant's motion for new trial, trial counsel testified that when he returned to the courtroom after the meeting

---

[11] Contrary to her recorded statement to investigators before Appellant's arrest, Daniel testified at trial that Appellant did not tell her that he was involved in a shooting or that he had killed someone. She claimed that she lied to the investigators because she was mad at Appellant for cheating on her.

with Daniel, he explained to Appellant that Daniel was going to testify but that he "didn't go into details" of what was discussed in the conference room. In its order denying the motion, the trial court ruled that Appellant acquiesced to his counsel's waiver of his right to be present.

(b) Appellant argues that his absence during the conference room meeting violated his state constitutional right to be present during his trial. "'This Court has long recognized that a criminal defendant has a state constitutional right to be present during all critical stages of the proceedings against him.'" *Howard v. State*, 307 Ga. 12, 21 (834 SE2d 11) (2019) (citation omitted). Pretermitting whether the meeting with Daniel was a critical stage at which Appellant had a right to be present, he acquiesced to his counsel's waiver of his presence.

A defendant may relinquish his right to be present if he personally waives it in court; if his counsel waives it at his express direction; if his counsel waives it in open court while he is present; or if his counsel waives it and he subsequently acquiesces to the

waiver. See *Howard*, 307 Ga. at 21. Acquiescence may occur when "'counsel makes no objection and a defendant remains silent after he or she is made aware of the proceedings occurring in his or her absence.'" *Burney v. State*, 299 Ga. 813, 820 (792 SE2d 354) (2016) (citation omitted). The question is whether the defendant "had sufficient information concerning [the proceeding occurring in his absence] to fairly construe his silence in this regard as acquiescence." Id.

In this case, the record shows that Appellant was present when Daniel failed to enter the courtroom after she was called to testify; when a prosecutor said that Daniel was refusing to testify because Appellant's threat had intimidated her and argued that the recording of Daniel's interview with investigators should be admitted into evidence; when the trial court announced that it was going to question Daniel in a conference room about whether she would testify; when the court told the lawyers, the court reporter, and Daniel's mother to come into the conference room; and when the judge, lawyers, and court reporter left the courtroom to go to the

15

conference room.[12] When they returned, Appellant's trial counsel explained to him that Daniel was going to testify. Appellant was also present when, after Daniel took the stand and again refused to testify, the court reminded her that they had already discussed that she was under subpoena and could be held in contempt if she did not testify. Moreover, when the trial was ending for the day, the court and a prosecutor discussed in Appellant's presence the court's questioning of Daniel outside the courtroom and the fact that neither the defendants nor their trial counsel had objected to that procedure.

Despite Appellant's presence during all of these discussions about the conference room meeting, there is no indication in the record that he expressed any concern or voiced any objection to his counsel or the trial court regarding his absence. Instead, the first

_____

[12] Appellant's assertion in his brief here that most of this discussion took place at the bench is not supported by the trial transcript, which shows that after Daniel was called to testify and the lawyers approached the bench, "a discussion was held off the record," but the trial court then went back on the record to ask the jury (but not the defendants) to leave, after which the court and lawyers discussed Daniel's refusal to testify before moving to the conference room.

time that he contended that his right to be present was violated was in his amended motion for new trial, which was filed nearly a year and a half after the trial. Under these circumstances, the trial court did not err in ruling that Appellant acquiesced to his absence from the court's meeting with Daniel. See *Scudder v. State*, 298 Ga. 438, 439-440 (782 SE2d 638) (2016) (holding that the defendant acquiesced to his absence when the trial court spoke with a witness in chambers about her refusal to testify, because the defendant knew that he had been excluded from the meeting and the nature of the discussion but did not object or ask for the transcript of the meeting to be provided to him). See also *Howard*, 307 Ga. at 22 (concluding that the defendant acquiesced to his absence when the trial court questioned a juror in chambers, because the defendant was present but failed to object when the court later explained that the in-chambers meeting had occurred, laid out the substance of the juror's testimony, and announced the juror's removal); *Jackson v. State*, 278 Ga. 235, 237 (599 SE2d 129) (2004) (concluding that the defendants acquiesced to their absence from an in-chambers

17

conference, because their counsel did not object and the defendants remained silent when the issue discussed during the conference was discussed again by counsel and the trial court while the defendants were present).

3. Appellant also contends that his trial counsel provided ineffective assistance in four ways. To succeed on these claims, Appellant must prove that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690.

> This is no easy showing, as the law recognizes a "strong presumption" that counsel performed reasonably, and Appellant bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent

18

attorney would have followed such a course."
*Brown v. State*, 302 Ga. 454, 457 (807 SE2d 369) (2017) (citations omitted). To establish prejudice, Appellant must prove that there is a reasonable probability that, but for his counsel's deficiency, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. We need not address both components of the *Strickland* test if Appellant makes an insufficient showing on one. See id. at 697.

(a) Appellant claims first that his trial counsel provided ineffective assistance by failing to request a ruling on his pretrial motion to sever Appellant's and Shealey's trials. Appellant has failed to prove either component of this ineffectiveness claim.

In a murder case where the death penalty is not sought, the trial court has broad discretion to grant or deny a motion for severance. See *Lupoe v. State*, 300 Ga. 233, 241 (794 SE2d 67) (2016).

> In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant;

and (3) the presence or absence of antagonistic defenses. Id. at 241-242 (citation and punctuation omitted). The joint trial in this case involved only two co-defendants; Appellant was tried for almost the same crimes as Shealey with respect to the fatal shooting (along with additional crimes related to the prior park shooting); the evidence and the law were substantially the same for both defendants; the State's theory was that they and their co-indictees acted together to commit the crimes; Appellant has identified no evidence admitted against Shealey that was not also admissible against Appellant; and the trial court instructed the jury to determine the guilt or innocence of each defendant separately. See id. at 242.

Appellant asserts that severance would have been required because the evidence of his affiliation with 4way was weaker than the evidence that Shealey was a member of the gang. As we have explained, however, to obtain a severance "it is not enough for the defendant to show that . . . the evidence against a co-defendant is stronger." *Nicholson v. State*, 307 Ga. 466, 474 (837 SE2d 362) (2019)

(citation and punctuation omitted). Moreover, the evidence that Appellant was involved in the shootings was actually stronger than the evidence of Shealey's involvement. See *Walter v. State*, 304 Ga. 760, 764 (822 SE2d 266) (2018).

Appellant also asserts that the trials should have been severed because Shealey's defense theory — that he was merely present in Green's car when Appellant and other members of 4way shot toward Tucker — was antagonistic to Appellant's defense that he was not involved in that shooting (or the park shooting). However,

> the mere presence of antagonistic defenses is insufficient to require severance in a non-death penalty case; instead, the defendant must show that "considering these antagonistic defenses, a joint trial was so prejudicial as to amount to a denial of his right to due process."

*Palmer v. State*, 303 Ga. 810, 815 (814 SE2d 718) (2018) (citation omitted). In an attempt to demonstrate this level of prejudice, Appellant points primarily to the opening statements, during which Shealey's counsel said that Appellant was "a killer" and that "the only person that's going to take the stand is going to be Mr. Shealey . . . . because he is asserting his innocence." But any prejudice from

those comments was limited by the trial court's instructions to the jury that the opening statements were not evidence and that in reaching its verdicts, the jury could not consider the defendants' decisions not to testify.[13] Thus, Appellant has not shown that Shealey's defense theory required a severance of the trials. See, e.g., *Walter*, 304 Ga. at 763 (concluding that severance was not required where the co-defendants blamed the defendant for the shooting while asserting that they were not present during or did not participate in the murder); *Palmer*, 303 Ga. at 815 (holding that severance of a joint trial was not required where the defendant claimed that he did not commit the crimes while his co-defendant claimed that the defendant pressured him into robbing the victims).

For these reasons, if Appellant's trial counsel had requested a ruling on the severance motion, the trial court would not have abused its discretion by denying it. Appellant has therefore failed to show deficient performance or prejudice, so this ineffectiveness

---

[13] In fact, as mentioned above, Shealey, like Appellant, ultimately elected not to testify.

claim fails. See, e.g., *Lupoe*, 300 Ga. at 242-243.

(b) Appellant claims next that his trial counsel was ineffective for failing to obtain a ruling on his motion to suppress evidence derived from a search warrant for Appellant's Facebook account. We disagree.

Shortly after the shootings, investigators learned through interviews with several witnesses that a person known as "K.J." was involved in the crimes. Five days after the shootings, an investigator obtained a search warrant for a Facebook account that belonged to "John Doe A[K]A 'K.J.'" The search warrant listed the crime of aggravated assault as the basis for the warrant, and an attachment to the warrant described the many things to be seized, which included a wide range of data from the account.[14] The execution of

---

[14] The data to be seized included, among other things, all contact information; photos and photo metadata; neoprints, links to videos, photos, articles, and other items; notes and postings; friend lists and groups; comments; search history; communications and messages; log data including all IP addresses that logged into the account; information about the use of Facebook Marketplace; length of service and types of service and payments; privacy and account settings; records pertaining to communications between Facebook and any person regarding the user or the user's account; location history; websites visited while logged into Facebook; website or mobile

23

the search warrant revealed Facebook messages between "K.J." and Daniel, which led investigators to interview Daniel. During the interview, she identified K.J. as Appellant, and he was later located and arrested.

Before trial, Appellant's counsel filed as part of an omnibus motion a "preliminary motion to suppress" evidence "illegally seized from [Appellant]," generally asserting, among other things, that the search warrant lacked sufficient particularity. The trial court did not rule on the motion, and counsel never requested a ruling. At trial, the court admitted several items of evidence collected as a result of the search warrant for Appellant's Facebook account, including the messages between Appellant and Sands about the TEC and pistol on the day of the shootings; messages and photos related to the evidence admitted under OCGA § 24-4-404 (b) showing that Appellant asked to borrow a gun to shoot up a house about three months before the murder; and other messages and photos linking

applications registered using Facebook credentials; and Instagram, Messenger, or What's App account usernames.

Appellant to the 4way gang.

Appellant claims that all of the evidence garnered from the search warrant should have been suppressed because the warrant was overbroad and therefore violated the Fourth Amendment's particularity requirement. See *Bryant v. State*, 301 Ga. 617, 619 (800 SE2d 537) (2017) (explaining that a search warrant that does not particularly describe the things to be seized violates the Fourth Amendment). Specifically, he argues that the warrant improperly required the disclosure of virtually all of his Facebook data without the data being limited to the date of the aggravated assault that served as the basis for the warrant.

In support of this argument, Appellant relies primarily on *United States v. Blake*, 868 F3d 960 (11th Cir. 2017), in which a panel of the United States Court of Appeals for the Eleventh Circuit said in dicta that two search warrants issued after the defendant was arrested for participation in a conspiracy to prostitute minors "unnecessarily" required the "disclosure to the government of virtually every kind of data that could be found in" the defendant's

Facebook account. Id. at 974. After observing that the search warrants "should have requested data only from the period of time during which [the defendant] was suspected of taking part in the prostitution conspiracy," id., the court expressly pretermitted deciding whether the warrants violated the Fourth Amendment, holding instead that the evidence they produced fell within the good faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (104 SCt 3405, 82 LE2d 677) (1984). See *Blake*, 868 F3d at 974-975.[15]

Eleventh Circuit holdings (much less dicta), even on federal law questions, are not binding on Georgia courts. See *Lofton v. State*, 310 Ga. 770, 777 n.6 (854 SE2d 690) (2021). And in any event, *Blake* did not involve circumstances like this case, where a murder

---

[15] In *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992), this Court held that Georgia statutory law does not recognize *Leon*'s exception to the exclusionary rule for evidence obtained by officers relying in good faith upon the validity of a search warrant that is later found to be invalid. See id. at 577. We recently explained that *Gary*'s reasoning was unsound and declined to extend it to other exclusionary rule exceptions, while deeming it unnecessary to determine whether *Gary*'s specific holding should be overruled. See *Mobley v. State*, 307 Ga. 59, 73-75 & n.21 (834 SE2d 785) (2019).

suspect's identity and location were unknown to investigators at the time the search warrant was issued. Appellant does not cite, and we have not found, any United States Supreme Court or Georgia appellate precedent that clearly holds that a search warrant requesting a wide range of data from a defendant's social media account violates the Fourth Amendment under these circumstances. See *Brannon v. State*, 298 Ga. 601, 612 (783 SE2d 642) (2016) ("In describing the items to be seized pursuant to a search warrant, the degree of specificity required is flexible and will vary with the circumstances involved." (citation and punctuation omitted)).[16]

---

[16] Indeed, less than a year after *Blake* (and four months after Appellant's trial), another Eleventh Circuit panel held in *United States v. Alford*, 744 Fed. Appx. 650 (11th Cir. 2018), that a trial court properly denied a defendant's motion to suppress evidence garnered from the execution of a search warrant that requested "nearly every kind of data that could be found in [the defendant's] Google account," because investigators did not know the defendant's identity when the warrant was issued and "the information requested was all potentially incriminating because it could have identified the [suspect]." Id. at 652-653. And even putting aside the issue of Appellant's then-unknown identity and location in this case, we note that at the time of his trial, some courts in other jurisdictions had upheld search warrants requesting broad disclosure of data from a defendant's social media account, see, e.g., *United States v. Ulbricht*, 858 F3d 71, 100-104 (2d Cir. 2017), abrogated on other grounds by *Carpenter v. United States*, 585 U.S. ___ (138 SCt 2206, 201 LE2d 507) (2018); *United States v. Pugh*, Case No. 1:15-CR-00116-NGG, 2015 WL 9450598, at *26-27 (E.D. N.Y. Dec. 21, 2015), although some others had

Given the lack of binding appellate precedent on this issue, Appellant has not carried his burden of showing that his trial counsel's failure to press for a ruling on the particularity of the Facebook search warrant was patently unreasonable, and this claim fails. See *Sawyer v. State*, 308 Ga. 375, 383 (839 SE2d 582) (2020) ("[T]rial counsel's failure to raise a novel legal argument does not constitute ineffective assistance of counsel."); *Esprit v. State*, 305 Ga. 429, 438 (826 SE2d 7) (2019) ("A criminal defense attorney does not perform deficiently when he fails to advance a legal theory that

---

not, see, e.g., *People v. Osejo*, Case No. A143092, 2017 WL 2351439, at *8 (Cal. App. May 31, 2017) (unpublished). Whether a search warrant for a defendant's entire social media account meets the Fourth Amendment's particularity requirement continues to be an evolving area of the law, which neither the United States Supreme Court nor our State's appellate courts have yet resolved. See, e.g., *Alford*, 744 Fed. Appx. at 652-653; *United States v. Hamilton*, Case No. 6:18-CR-57-REW-10, 2019 WL 4455997, at *4-6 (E.D. Ky. Aug. 30, 2019) (saying in dicta that a warrant authorizing a search of essentially all of the defendant's Facebook data for a ten-month period was overbroad because the warrant should have targeted certain categories, but holding that the warrant fell into the *Leon* good faith exception to the exclusionary rule); *United States v. Liburd*, Case No. 17-CR-296 (PKC), 2018 WL 2709199, at *2-3 (E.D. N.Y. June 5, 2018) (holding that a search warrant was not overbroad in allowing the FBI to search the entire contents of the defendant's Facebook account because there was probable cause to believe that the account contained evidence of criminal activity and noting that "'avoiding the intrusiveness of a search [of a Facebook account] while maintaining its efficacy is largely infeasible'" (citation omitted)).

would require 'an extension of existing precedents and the adoption of an unproven theory of law.'" (citation omitted)).[17]

(c) Appellant claims that his trial counsel should have requested a jury instruction on the requirement for corroboration of accomplice testimony. See OCGA § 24-14-8. Even assuming that counsel performed deficiently in this respect, Appellant has failed to show prejudice.

"[I]t is well settled that an accomplice's testimony may be corroborated by the testimony of another accomplice." *Jordan v. State*, 307 Ga. 450, 455 (836 SE2d 86) (2019). The five co-indictees who testified that Appellant was involved in the shootings — Green, Lee, Rutledge, Holloway, and Gilliam — substantially corroborated each other's testimony. Their testimony was also corroborated by

---

[17] As Appellant points out in his brief, the search warrant cited an incorrect section of the Georgia Code for the crime of aggravated assault. However, "[m]ere typographical or clerical errors do not ordinarily provide a basis to suppress evidence." *Dent v. State*, 303 Ga. 110, 117 (810 SE2d 527) (2018). See also OCGA § 17-5-31. Thus, Appellant's trial counsel did not perform deficiently by failing to challenge the search warrant on this ground either. See *Keller v. State*, 308 Ga. 492, 499 (842 SE2d 22) (2020) (explaining that trial counsel cannot be found deficient for failing to file a meritless motion to suppress evidence.).

other evidence, including Appellant's Facebook message to Sands about the TEC handgun on the day of the murder, Todd's testimony that Appellant shot from her car into the Granger Park lot, and his admission to Daniel that he was involved in a shooting and had killed someone.

Appellant argues that his trial counsel's failure to request an accomplice-corroboration instruction was prejudicial because a prosecutor mentioned in closing argument that the testimony of a single witness is sufficient to establish a fact. But the trial court did not give the jury a single-witness instruction, and the court charged the jury that it is the court's duty to instruct on the law that applies to the case. In sum, Appellant has not shown a reasonable probability that his trial counsel's failure to request an accomplice-corroboration instruction affected the outcome of his trial. See *Jordan*, 307 Ga. at 455; *Robinson v. State*, 303 Ga. 321, 324-326 (812 SE2d 232) (2018); *Huff v. State*, 300 Ga. 807, 813 (796 SE2d 688) (2017).

(d) Finally, Appellant claims that his trial counsel provided

ineffective assistance by failing to request a proper limiting instruction on the other acts evidence. At a pretrial hearing, the trial court ruled over the objection of Appellant's counsel that Appellant's messages to an unknown person on Facebook asking to borrow a gun to "shoot somebody['s] house up" about three months before Tucker's murder would be admissible as other acts evidence for the purposes of showing intent and plan under OCGA § 24-4-404 (b).[18] At trial, before that evidence was presented to the jury, the court instructed in pertinent part that the evidence was admitted "for the limited purpose of the State's trying to show intent and trying to show a plan" and that the jury could not consider the evidence for any other purpose or as evidence that Appellant "would be of a character that he would commit the crimes alleged in the indictment."

Appellant contends that his trial counsel should have objected

_____

[18] OCGA § 24-4-404 (b) says in pertinent part:
Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of . . . intent [or] plan[.]

to the limiting instruction on the ground that the other acts evidence was not admissible for the purpose of showing a plan. But even assuming (without deciding) that the other acts evidence was not admissible for that particular purpose,[19] and that trial counsel was deficient in this respect, Appellant has not established prejudice. The trial court also admitted the evidence for the purpose of showing intent, and Appellant does not challenge the admission or the jury's consideration of the evidence for that purpose.[20] This evidence, which was admissible for one purpose and came with a limiting instruction that it could not be considered as evidence of Appellant's character, was tangential to the strong direct evidence of Appellant's involvement in the shootings. Accordingly, there is no reasonable probability that the outcome of Appellant's trial would have been different had the jury not been instructed that it could consider the evidence for the additional purpose of showing a plan. See, e.g.,

---

[19] We discussed two different types of "plan" evidence in *Heard v. State*, 309 Ga. 76, 87-88 & n.16 (844 SE2d 791) (2020).

[20] Because Appellant does not dispute the admission or consideration of this evidence to show his intent, we render no opinion on those issues.

*Armstrong v. State*, 310 Ga. ___, ___ (852 SE2d 824) (2020) (holding that trial counsel was not ineffective for failing to seek a limiting instruction regarding the purpose for which evidence was admitted under OCGA § 24-4-404 (b), because the appellant did not show that the absence of the instruction probably affected the outcome of his trial); *Davis v. State*, 302 Ga. 576, 583 (805 SE2d 859) (2017) (concluding that trial counsel was not ineffective for failing to request a limiting instruction regarding evidence of the appellant's prior altercations with others, because the appellant could not show prejudice in light of the "strong evidence against him at trial").

Appellant also argues that his trial counsel should have requested that the trial court give a second limiting instruction during its final jury charge. But he cites no pertinent authority that would have required the trial court to twice provide such an instruction, and we have found none. Cf. *Brewner v. State*, 302 Ga. 6, 15-16 (804 SE2d 94) (2017) (concluding that trial counsel was *not* ineffective for failing to request a limiting instruction contemporaneous with the admission of evidence under OCGA § 24-

4-404 (b), where the trial court gave such an instruction during the final charge). Appellant therefore has not shown that his trial counsel performed deficiently in this respect. This claim of ineffective assistance, like the others, fails.[21]

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 15, 2021.
Murder. Troup Superior Court. Before Judge Palmer.
*Matthew K. Winchester*, for appellant.
*John H. Cranford, Jr., District Attorney, John C. Winne, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.

---

[21] Appellant also asserts that the cumulative effect of his trial counsel's alleged errors prejudiced the outcome of his trial. But even considering the combined effect of the deficiencies assumed in Division 3 (c) and (d), we conclude that Appellant has not demonstrated a reasonable probability that the outcome of his trial would have been different in the absence of the deficiencies alleged. See, e.g., *Bentley v. State*, 307 Ga. 1, 11 (834 SE2d 549) (2019); *Toomer v. State*, 292 Ga. 49, 59 (734 SE2d 333) (2012).