NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 19, 2024

S24A0270.  DURDEN v. THE STATE.

MCMILLIAN, Justice.

Appellant Devin Durden was convicted of felony murder and other crimes in relation to the shooting death of Dewayne Chronister.[1]   On appeal, Durden argues that the trial court

---

[1] Chronister died on October 17, 2016.  On December 19, 2017, a Muscogee County grand jury indicted Durden, along with Dontavis Screws and Jasmine Thomas, charging them with malice murder (Count 1), felony murder predicated on armed robbery (Count 2), armed robbery (Count 3), and possession of a firearm during commission of a felony (Count 4).  Following Screws's guilty plea to the lesser offenses of voluntary manslaughter and robbery and Thomas's guilty plea to the lesser offense of robbery, Durden was tried from February 26 through March 1, 2019, and a jury found him not guilty of malice murder but guilty of all the remaining counts.  On April 2, 2019, the trial court sentenced Durden to life in prison for felony murder, a consecutive sentence of ten years to serve for armed robbery, and a consecutive sentence of five years to serve for possession of a firearm during the commission of a felony.

Durden filed a timely motion for new trial on April 12, 2019, which was amended on December 9, 2020.  Following a hearing on January 6, 2022, the trial court denied Durden's motion for new trial, as amended, on February 1, 2022.  Durden filed a timely notice of appeal on February 17, 2022, and the case was docketed to the term of this Court beginning in December 2023 and thereafter submitted for a decision on the briefs.

committed plain error by (1) permitting a detective to provide extensive narrative testimony identifying Durden as the person depicted in surveillance footage and (2) instructing the jury on single-witness testimony without also instructing it on accomplice corroboration. Durden also argues that the cumulative harm caused by these alleged errors warrants reversal. For the reasons that follow, we affirm in part and vacate in part.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed that in the early-morning hours of October 17, 2016, officers from the Columbus Police Department were called to the Parkwood mobile home park off Farr Road, where the body of Chronister, a taxi driver, was found in the driver's seat of his taxi. Chronister died from a gunshot to the head; the bullet entered the left side of his head and was recovered from his brain. Law enforcement's investigation—which included a review of the taxi company's call logs showing the number that called for the taxi and where that caller requested to be picked up, a nearby gas station from which law enforcement was able to obtain and review

surveillance footage—led them to identify Durden, Screws, and Thomas as suspects and arrest them for the crimes.

Co-indictees Screws and Thomas both testified on behalf of the State as part of their plea bargains. Thomas testified that around 4:00 a.m. on the morning of October 17, 2016, Durden knocked on the door of her home as she and Screws were asleep inside. She said that Screws let Durden inside, and Durden asked Screws, "are you trying to make some money?" After some more discussion, during which Thomas saw Durden handling a firearm, Thomas called a taxi for Durden and Screws and told them to go to the nearby gas station, which was less than a five-minute walk away, to meet the taxi.[2] After she called the taxi for the men and they left, Thomas went back to sleep. She testified that Durden and Screws returned around 7:00 a.m., and she heard them talking about how to divide "the money," with Durden telling Screws that Screws was not

---

[2] Call logs from the taxi company showed that Thomas's cell phone number was used to call for a taxi in the early-morning hours of October 17 and that Thomas's request for a taxi was the last pick-up Chronister made before his death.

getting half because "you did not do anything." Thomas testified that Durden then told them that he was "fixing to go drop the gun off because it was hot," and he left. After Durden left, Screws told Thomas that when their taxi arrived at Farr Road to drop them off, Durden "got out and had opened the cab driver's door and said, it's a robbery and shot the man in the head." Thomas identified Durden from a photo captured by the gas station's surveillance camera, testifying that she recognized Durden from the clothes he had worn to her home that night and from a speaker that hung from his belt and that there was not "any doubt in [her] mind" about who he was. She also identified Durden and Screws from the surveillance video when it was played for her.

Screws testified that Durden came to Screws and Thomas's house late at night on October 17 while he and Thomas were in bed. Durden and Screws began talking, and Durden "pulled out his gun and sat it on the counter," and told Screws that he wanted to "[g]o hit a lick" to "get some money," meaning he wanted to commit a

4

robbery.[3]  They decided to have Thomas call a taxi for them to rob. According to Screws, he and Durden then walked to the gas station, where they got in the taxi, and they had the driver take them to Parkwood mobile home park on Farr Road, where Durden "held the gun on the man and then he shot the man and that's when we took off running.  He got the money and we took off running."[4]  Screws testified that Durden took the victim's wallet and cell phone, that Durden threw the cell phone in a ditch as they ran back to Screws's home,[5] and that after they arrived back at Screws's home, they split the money and Durden left.  Screws also identified Durden from the gas station's surveillance video, getting in the taxi with Screws and wearing the same shoes that law enforcement later recovered from

---

[3] Screws recognized the gun to be a .380-caliber High Point.  When law enforcement processed the crime scene, they recovered a .380-caliber shell casing on the ground near the taxi driver's door, which a firearms expert examined and testified was "consistent with being fired from a high point .380 semi-automatic pistol."

[4] Surveillance footage from the Parkwood mobile home park showed a taxi enter Parkwood at around 5:00 a.m.; about five minutes later, two men are shown fleeing Parkwood on foot down Farr Road; the taxi was never shown exiting the mobile home park.

[5] Law enforcement later recovered Chronister's cell phone from the ditch where Screws told them Durden had thrown it.

Durden, as well as from a still shot from that video, which Screws testified showed a Bluetooth speaker that Durden wore hanging from his belt.

Columbus Police Detective Stuart Carter testified that he was the lead investigator's partner and assisted in the investigation by, among other things, obtaining and reviewing the surveillance footage from the gas station, where Chronister's taxi had been last dispatched. As Detective Carter began discussing that footage during his direct examination, he testified, "we believe this to be the defendant that's in the courtroom today and there are several factors that we relied on." Detective Carter went on by pointing out that the individual depicted in the footage wore a particular "style of sweatpants"; a wristwatch "with a rather large face"; a Bluetooth speaker hanging from his waist; and "most significant[ly]," a "very distinctive" yellow, green, and grey pair of shoes, which Detective Carter determined from his investigatory research to be Nike Pegasus 32 shoes. These items ended up being "similar" or "identical" to clothing items and accessories, including a pair of Nike

6

Pegasus 32 shoes, recovered from the residence where Durden told Detective Carter he had been "staying" upon Durden's arrest.[6] Detective Carter also explained that the individual in the surveillance footage had a "distinctive" and "almost an identi[cal] hair style" to Durden's at the time of his arrest. Detective Carter also identified Durden from several still shots from the surveillance footage based on "[t]he clothing that I pointed out, the shoes that we would later recover, [and] the physical build of the individual." According to Detective Carter, the footage showed Durden and Screws getting into Chronister's taxi at the gas station at around 5:00 a.m. Within minutes, Chronister was shot and killed at the nearby Parkwood mobile home park.

    1.    Conceding that the above-described testimony of

---

[6] We note that Detective Carter testified regarding two portions of the gas station's video surveillance footage from the night of the crimes: one from earlier that night, and the other from the time the crimes were unfolding. In the footage from earlier that night, it is relatively easy to make out the facial features of the person whom Detective Carter identified as Durden, but in the footage from later that night when the individual (along with Screws) approached and got into Chronister's taxi, it is more difficult to make out the identity of the individual, who had his hood pulled up at that point.

Detective Carter was permitted "[w]ithout meaningful objection or admonishment," Durden contends that the trial court plainly erred in permitting Detective Carter to testify at length that Durden was the person depicted in the surveillance video and still images, thus violating the limitation on lay opinion imposed by OCGA § 24-7-701 (a).

To establish plain error, Durden must meet each prong of a four-prong test:

> First, there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Washington v. State*, 312 Ga. 495, 498 (1) (863 SE2d 109) (2021) (citation and punctuation omitted). "As we have noted, affirmatively

8

establishing all four prongs is a difficult standard to satisfy." Id. at 498-99 (1) (citation and punctuation omitted). "This Court does not have to analyze all elements of the plain-error test where an appellant fails to establish one of them." *Payne v. State*, 314 Ga. 322, 325 (1) (877 SE2d 202) (2022).

Here, Durden hinges his argument on an alleged violation of OCGA § 24-7-701 (a), which provides:

> (a) If the witness is not testifying as an expert, the witness's testimony in the form of opinion or inferences shall be limited to those opinions or inferences which are:
> (1) Rationally based on the perception of the witness;
> (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and
> (3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

We have explained that "where there is 'some basis for concluding that a witness is more likely to correctly identify a defendant as the individual depicted in surveillance [images], then lay opinion testimony identifying a defendant in surveillance [images] is

admissible under Rule 701.'" *Glenn v. State*, 306 Ga. 550, 555 (3) (832 SE2d 433) (2019) (quoting *Glenn v. State*, 302 Ga. 276, 280 (II) (806 SE2d 564) (2017) (citation and punctuation omitted).

We start by noting that the vast majority of Detective Carter's relevant commentary on the surveillance footage was non-opinion, factual testimony about the attire he personally observed worn by the individual depicted therein and the attire he personally recovered from Durden's residence, and as such, that testimony is not governed by Rule 701 (a)'s provisions regarding lay opinion testimony. See *Cooper v. State*, 317 Ga. 676, 685 (2) (895 SE2d 285) (2023). As for Detective Carter's identification of Durden from the surveillance footage, Durden argues that because Detective Carter was not familiar with him on a personal level and had "no unique first-hand experience with Durden," Detective Carter could not be permitted under Rule 701 (a) to opine that Durden was the individual depicted therein and that the trial court thus clearly erred in permitting such testimony.

Assuming without deciding that the trial court clearly erred in

permitting Detective Carter's identification testimony, we conclude that Durden has failed to show that the error affected the outcome of the proceedings because the identification testimony was cumulative of Thomas's and Screws's identification of him from the same surveillance footage. Durden makes no argument that either Thomas's or Screw's identification testimony was improper, and they were more familiar with Durden than Detective Carter, making their identification testimony more compelling. Thus, Durden cannot satisfy the third prong of the plain error test. See *Grier v. State*, 313 Ga. 236, 245 (3) (f) (869 SE2d 423) (2022) ("Appellant has not met his burden under the plain error standard to show a reasonable probability that the outcome would have been different, as the improperly admitted [testimony] was merely duplicative of other properly admitted evidence."). Accordingly, this enumeration of error fails.

2. Conceding that trial counsel neither requested an accomplice-corroboration charge nor objected to the trial court's failure to give such charge, Durden also contends that the trial court

plainly erred by failing to instruct the jury on accomplice corroboration despite charging the jury that the testimony of a single witness is generally sufficient to establish a fact. See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness."); OCGA § 17-8-58 (b) ("Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section."). Durden's claim fails.

Here, the trial court committed clear and obvious error in failing to give the accomplice-corroboration charge while giving the

12

single-witness charge since Durden's co-indictees, Screws and Thomas, testified at trial, see *State v. Johnson*, 305 Ga. 237, 240 (1) (824 SE2d 317) (2019); *Stanbury v. State*, 299 Ga. 125, 130-31 (2) (786 SE2d 672) (2016), and Durden did not affirmatively waive the instructional error. But the record demonstrates that the error likely did not affect the outcome of Durden's trial, such that he has not satisfied the third prong of the plain error test. See *Rice v. State*, 311 Ga. 620, 623 (1) (857 SE2d 230) (2021). Co-indictees Screws and Thomas each testified regarding Durden's involvement in the crimes; their testimony "substantially corroborated each other's testimony"; and "it is well-settled that an accomplice's testimony may be corroborated by the testimony of another accomplice." *Hurston v. State*, 310 Ga. 818, 830 (3) (c) (854 SE2d 745) (2021) (citation and punctuation omitted); see also *Payne*, 314 Ga. at 327 (1) ("[H]ad the jury been given an accomplice-corroboration instruction, the testimony of any witness the jury concluded was an accomplice could have been corroborated by [ ] non-accomplice witnesses or by the testimony of another accomplice."). Moreover,

13

their testimony was also corroborated by other evidence, including the gas station and mobile home park surveillance footage showing that Durden and Screws rode in Chronister's taxi from the store to the crime scene; the recovery of a .380-caliber shell casing on the ground near Chronister's taxi door that was consistent with being fired from a High Point .380 pistol, corroborating Screws's testimony as to the type of gun Durden possessed and where Durden stood when he shot Chronister; testimony and records from the taxi service corroborating Screws's and Thomas's testimony that Thomas called for a taxi for Screws and Durden during the early-morning hours of October 17, 2016; and the recovery of the victim's cell phone from the location where Screws told law enforcement that Durden had thrown it. Had the charge been given, it is highly likely the jury would have returned the same verdict. See *Payne*, 314 Ga. at 326-27 (1) (failure to give accomplice-corroboration charge despite giving single-witness charge likely did not affect trial outcome where other evidence and witness testimony, including that of other potential accomplices, implicated appellant in the crimes); *Rice*, 311 Ga. at

14

623-24 (1) (clear error in failing to charge jury on accomplice corroboration despite giving single-witness charge likely did not affect trial outcome where jury could have found accomplices' testimony was mutually corroborating and where there was other substantial and consistent evidence showing appellant participated in crimes). Cf. *Johnson*, 305 Ga. at 241 (holding that trial court's failure to give accomplice-corroboration charge likely affected trial's outcome where "virtually all of the incriminating evidence flowed from" accomplice).

Durden has not shown that the trial court's clear error in failing to give an accomplice-corroboration charge likely affected the outcome of his trial, and therefore he has not satisfied the third prong of the plain-error test. Accordingly, this enumeration of error also fails.

3. Durden contends that cumulatively, the trial court's alleged errors were harmful and merit reversal. "When this Court has identified or presumed more than one error, although the effect of each on its own might have been harmless," we will "consider

15

collectively, rather than individually, the prejudicial effect, if any, of the trial court errors." *Nundra v. State*, 316 Ga. 1, 16 (6) (885 SE2d 790) (2023) (citations and punctuation omitted). Even considering the assumed error in permitting Detective Carter's identification testimony and the error in failing to give an accomplice-corroboration instruction, we conclude that Durden has not demonstrated under the plain-error standard that, but for these errors, the outcome of the proceeding would have been different. As noted above, Detective Carter's identification testimony was cumulative of other unobjected-to testimony (mainly, that of the accomplices who also corroborated one another by both identifying Durden from the same surveillance footage), and there was ample evidence otherwise corroborating the accomplices' testimony. Thus, this claim fails. See *Payne*, 314 Ga. at 334 (4) (no cumulative prejudice from failure to give accomplice-corroboration instruction and failure to object to hearsay testimony because hearsay testimony was cumulative and "[t]he jury heard a significant amount of incriminating testimony").

16

4. Finally, although Durden does not raise the issue on appeal, "[w]hen the only murder conviction is for felony murder and a defendant is convicted of both felony murder and the predicate felony of the felony murder charge, the conviction for the predicate felony merges into the felony murder conviction." *Allen v. State*, 307 Ga. 707, 710-11 (5) (838 SE2d 301) (2020) (citation and punctuation omitted). Because Durden's conviction for felony murder is predicated on armed robbery, the trial court should not have separately sentenced Durden on the armed robbery conviction. Therefore, we exercise our discretion to vacate Durden's conviction and sentence for armed robbery. See *Dixon v. State*, 302 Ga. 691, 696-97 (4) (808 SE2d 696) (2017) (appellate court has discretion to correct merger error that is clear and obvious, particularly when such error harms the defendant).

*Judgment affirmed in part and vacated in part. All the Justices concur.*