316 Ga. 196
FINAL COPY

S23A0066. INGRAM v. THE STATE.

LaGrua, Justice.

Appellant Tyree Ingram was convicted of felony murder and other crimes in connection with the fatal shooting of LaMarcus Brown during the early morning hours of September 13, 2019.[1] On appeal, Ingram contends that his trial counsel rendered ineffective assistance by (1) failing to object to good character evidence of the victim; (2) failing to object to and redact the portion of Ingram's

---

[1] In November 2019, Ingram was indicted by a Baldwin County grand jury on charges of malice murder, three counts of felony murder, armed robbery, aggravated assault, possession of a firearm by a first offender, possession of cocaine, and theft by receiving stolen property. In April 2021, a jury found Ingram guilty of all counts except malice murder. The trial court sentenced Ingram to life in prison, plus an additional 13 years. Two of the felony murder counts were vacated by operation of law, and the armed robbery count and aggravated assault count merged with the felony murder count for sentencing purposes. On April 26, 2021, Ingram filed a timely motion for new trial, which he amended twice through new counsel on December 17, 2021, and on January 7, 2022. Following an evidentiary hearing, the trial court denied Ingram's motion for new trial on February 18, 2022. Ingram filed a timely notice of appeal to this Court on March 4, 2022, and the case was docketed to the term of this Court beginning in December 2022 and submitted for a decision on the briefs.

recorded statement to law enforcement officers where he mentioned his juvenile criminal history; and (3) failing to object to the classification of Ingram's first offender sentence as a "conviction" when it was tendered into evidence by the State. Ingram also contends that the cumulative effect of trial counsel's ineffectiveness entitles him to a new trial. For the reasons that follow, we affirm Ingram's convictions.

The evidence presented at Ingram's trial showed that, on September 12, 2019, Ingram and Brown arranged to meet for Ingram to buy drugs from Brown. Ingram's cousin, Quartarvius Greene, gave Brown's contact information to Ingram because Greene "used to buy weed" from Brown. According to Ingram, who testified in his own defense at trial, he and Brown decided to meet "around like 12:00 [a.m.]" in the parking lot of the Georgia War Veteran's Home (the "Veteran's Home") in Milledgeville. Ingram testified that "[t]he plan was that [Brown] was supposed to credit [Ingram] an ounce of marijuana and an eight-ball of cocaine," and Ingram "was just supposed to pay him back" when Ingram got paid.

2

Around 9:00 p.m., Brown called his girlfriend, Deasia Parks, and told her that he was going to drop his children off at their mother's house and then he was going to "make a play"[2] before he came over to Parks's house. Shanesia Ford, the mother of Brown's children, testified that Brown dropped their children off at her house around 9:30 p.m. and told her "that he would be back around 12:00." Ford testified that Brown, who she knew sold drugs, "wasn't acting like himself" and had a "nervous look" in his eye she "had never seen before."

Ingram was living with his mother at the Edgewood Apartments at this time and did not have a car. That night, Ingram borrowed a gold or tan 2002 Grand Marquis from Lashala Fluellen,[3] the mother of his best friend, who also lived at the Edgewood Apartments. Fluellen testified that she loaned Ingram her Grand Marquis around 9:00 or 10:00 p.m., so he could "take one of his friends to work" because "the guy was supposed to be at work like

---

[2] Parks testified that "make a play" meant "sell some drugs."
[3] Fluellen also owned a Chevrolet Trailblazer.

3

12 that night." Greene — who also resided at the Edgewood Apartments — testified that he worked the midnight shift at the Veteran's Home as a security officer, and Ingram was supposed to give him a ride to work in Fluellen's car but did not pick him up. Ingram admitted that he did not take Greene to work as planned and instead used Fluellen's Grand Marquis to meet Brown at the Veteran's Home.

According to Ingram, between "11:45 and midnight," he stopped by a gas station for a few minutes and then drove to the Veteran's Home to meet Brown.[4] When Ingram arrived at the Veteran's Home, a grey Nissan Altima was already parked in the lot. Ingram parked the Grand Marquis and waited outside the car because he did not know that the Altima belonged to Brown. Ingram testified that Brown got out of the Altima and walked over to Ingram, asking if he was "the guy [Brown] was talking on the phone with." Ingram confirmed, and the men walked over to Brown's car

---

[4] Security footage from the gas station confirmed that a gold or tan Grand Marquis pulled into the gas station at 11:52 p.m. and left the gas station at 11:57 p.m.

"to make the transaction." Ingram testified that he got into Brown's car, paid Brown $35 for an "eight-ball of cocaine," "got out of the car" and "left." According to Ingram, after leaving the Veteran's Home, he drove through Milledgeville Manor — a nearby apartment complex where his sister lived — stopped by a gas station to "thr[o]w some trash out,"[5] and "went home." Ingram testified that, when he got home, he put the eight-ball of cocaine in Fluellen's Trailblazer, which was parked at the Edgewood Apartments.

Kimberlie Mason, Crystal Justice, and Mikelya West testified that, late on the night of September 12, they were hanging out on Mason's front porch at Milledgeville Manor — where Mason and Justice lived — when Ingram drove up and asked to see his "sister," Iyania Ingram, who is Mason's daughter. According to Justice and West, Ingram was driving a Grand Marquis, and he told the women that he needed to give his sister "a hug" because he "done shot this

---

[5] Security footage from the gas station confirmed that a gold or tan Grand Marquis pulled into the gas station at 1:15 a.m. on September 13 and that Ingram exited the vehicle, threw something into the trash can, and left in the Grand Marquis.

man" about "five or six times" and was "about to go to jail."  At trial, Mason refused to testify about what Ingram said to the women that night, stating that she was "plead[ing] the Fifth."  The State showed Mason a copy of the written statement she had given to law enforcement officers, which she identified as being in her handwriting and bearing her signature, and the statement was then admitted into evidence and read to the jury.  In Mason's statement, she reported that, when Ingram arrived outside her apartment that night, he "ask[ed] where his sister [was]" and "said he wanted to tell his sister he love[d] her and she was not going to see him for about 30 years" because "he just shot" someone who "tried to rob him."  Mason then went inside the apartment and woke Iyania, who was sleeping.  Iyania testified that when she came outside, Ingram was standing there and told her that he loved her and that he "just shot somebody four or five times."  After hugging Iyania, Ingram got back into the Grand Marquis and left.

Ford testified that she tried to call Brown on his cell phone around 11:30 or 11:45 p.m. because she had not heard from him, but

6

"[h]is phone kept going straight to voice mail." Parks testified that she also tried calling Brown around midnight, but could not get through to him. According to both women, they never spoke to or saw Brown alive again.

Around 8:00 a.m. on September 13, Brown's body was discovered inside his Nissan Altima parked in front of the home of Steven and Camesha Grant on Davis Street, a few blocks from the Veteran's Home. Camesha noticed the vehicle when she left for work that morning, and Steven went outside to investigate.[6] When Steven looked inside the vehicle, he observed a man — later identified as Brown — "slumped over" between the seats who appeared to be "reaching to the back seat from the passenger seat." Steven testified that he could see blood on the man's shirt, and when he knocked on the window of the vehicle, the man was non-responsive. Steven called Camesha and asked her to call 911.

Around the same time, Grady Jones was driving down Davis

---

[6] According to Steven, the vehicle was not parked in that location around 11:00 p.m. or 12:00 a.m. the night before.

Street and noticed a grey Nissan Altima parked along the roadway. Jones recognized the vehicle as belonging to Brown, so he got out of his car and looked through the driver's side window of the Altima, where he observed a man between the seats "almost like he was trying to get in the back seat or something." Jones opened the back passenger side door, and when he saw the man's face, he confirmed the man was Brown.

Law enforcement officers with the Baldwin County Sheriff's Office arrived on the scene shortly afterward. One of the first officers to arrive, Deputy Melissa Condon, looked inside the Altima and similarly observed Brown "slumped over between the passenger and driver side seats," with blood on his clothes and bullet wounds on both sides of his body. Major Brad King, another responding officer, noted that the driver's seat of the Altima was "very far forward," and "[i]t appeared that it would have been very difficult to drive the vehicle with the seat in that position." Major King also observed that the vehicle was "cool to the touch," indicating that it "had been sitting there for quite some time."

GBI Special Agent Brian Hargrove[7] processed the scene that morning, and during his search of the interior of the vehicle and the area surrounding the vehicle, he located two .40-caliber shell casings[8] — one on the driver's side front floorboard and the other in the roadway "very close to the driver's door" — as well as bullet fragments on the back seat. According to Special Agent Hargrove, after examining Brown's body at the morgue, he determined that Brown likely died from "injuries that were consistent with gunshots," located "on each side of his body," including one on Brown's upper right arm "that had what appeared to be sooting around the defect," demonstrating that the muzzle of the gun was "close" to "the target surface" when it was fired. Special Agent Hargrove also noted an irregular-shaped bloodstain pattern on Brown's left arm, which was "very similar to the muzzle of a firearm,

---

[7] Special Agent Hargrove was admitted as an expert at trial in the areas of crime scene examination and processing and bullet flight-path reconstruction.

[8] A firearms examiner for the GBI testified that these shell casings were fired from a .40-caliber pistol, "most likely a Smith & Wesson."

in particular, a semi-automatic pistol." According to the medical examiner, a bullet traveled through Brown's upper right arm and entered into his chest through his right armpit, damaging his lungs and ascending aorta. The medical examiner determined that "[t]he cause of death [was] multiple gunshot wounds."

After Special Agent Hargrove's investigation, he concluded that Brown "was sitting in the driver's seat when he was shot" and was then moved by someone else into the position in which he was found. Special Agent Hargrove located two "usable latent prints" on Brown's vehicle — one on the front passenger side window and the other on the front passenger side doorframe. Fingerprint testing revealed that the fingerprint on the passenger side window belonged to Ford, and the fingerprint on the passenger side doorframe belonged to Ingram.

Detective Robert Butch, one of the investigating officers, obtained "an exigent order" for Brown's cell phone records,[9] and after reviewing those records, he determined that there were 14 calls

_____

[9] Brown's cell phone was never recovered.

between Brown's cell phone and Ingram's cell phone on the night of September 12, beginning at 8:22 p.m. Six of the calls were from Ingram's cell phone to Brown's cell phone, and eight of the calls were from Brown's cell phone to Ingram's cell phone. The last call placed from Brown's cell phone was to Ingram's cell phone at 12:13 a.m. on September 13.

On the evening of September 13, law enforcement officers found Ingram at the Edgewood Apartments, and Ingram went to the sheriff's office for an interview. After reading Ingram his rights under *Miranda*[10] and obtaining a waiver of those rights, Detective Butch asked Ingram what he was doing the night before, and Ingram told Detective Butch that he borrowed Fluellen's car and was out driving around, stopping by a gas station once or twice between 11:45 p.m. and 1:30 a.m. Detective Butch asked Ingram if he saw Brown that night, and Ingram denied meeting with Brown or killing Brown. Ingram was released after this interview.

---

[10] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

After further investigation, Detective Butch interviewed Ingram a second time on September 17, 2019. Detective Butch read Ingram his rights under *Miranda*, after which Ingram agreed to talk to Detective Butch about what occurred on the night of September 12. Ingram also provided a written statement, in which he stated the following:

> I left Edgewood Apartments to go make a deal with LaMarcus Brown. I stopped by [a gas station] across from Sonic to get some gas for the car. I left the gas station and went to the Veteran's Home parking lot to meet [Brown]. He got out of his car to greet me. We shook hands and we walked to his car. And when we got in the car, I left the door open some and [he] showed me some drugs he had. And I got them[,] and in the process of the transaction, we started talking about buying and selling guns. And I showed him the one I was selling. And when I let him hold it, he pointed the gun at me trying to rob me. And I pushed his arm up and twisted the gun and it fired off and hit him and he started reaching for something under his seat. And I ran and I shot two more times into the car. And I left. I stopped by the Manor and seen my little sister. I told her that I love her and I left. Went home. I came back to the Veteran's Home to move the body down the road. I got his phone, took the battery out[,] and I threw them out the car and I went home. I really didn't mean to do it. It was all self-defense with the shooting.

In addition to providing the written statement, Ingram told

Detective Butch that Greene had given him Brown's cell phone number, and Ingram had set up the meeting with Brown to buy drugs. Ingram admitted to communicating with Brown on September 12 and to having deleted several text messages between them, as well as a program he used to text Brown from his cell phone on the morning of September 13. Ingram also told Detective Butch that he brought a gun with him to the meeting with Brown and that he had purchased this gun in July 2019. Ingram explained that the gun and the cocaine he purchased from Brown could be located at the Edgewood Apartments; specifically, the gun was located in the bushes behind the exterior of one of the apartment buildings, and the cocaine was stashed inside Fluellen's Trailblazer. Ingram also admitted that, after the shooting, he took Brown's cell phone, broke it apart, threw part of it out of the window while he was driving, and then threw the back of the phone into a trash can at a gas station. Ingram told Detective Butch that he threw away the clothes he had been wearing that night.

Detective Haley Beckham testified that, while Ingram was being interviewed on September 17, she was asked to look for a gun and cocaine at the Edgewood Apartments. She located a "small black handgun," which she identified as a ".40 Smith & Wesson," on the rear side of the apartments underneath some shrubbery. Detective Beckham also obtained consent from Fluellen to search both of her vehicles — the Grand Marquis and the Trailblazer. Detective Beckham located a small bag of cocaine in the center console of the Trailblazer.

Quinshoun Henderson testified at trial that his .40-caliber Smith & Wesson was stolen on July 30, 2019. According to Henderson, he typically left his gun in his car or his bedroom, and on July 30, after waking up from a nap, he discovered that the gun was missing. Henderson immediately reported the theft of his gun to the police. Henderson testified that Ingram was living with him during this timeframe. At trial, Henderson identified the gun located by law enforcement at the Edgewood Apartments on September 17 as the gun that was stolen from him. An officer with

14

the Milledgeville Police Department also testified that the gun found at the Edgewood Apartments had the same serial number as the gun Henderson reported as stolen in July 2019.[11]

At trial, Ingram acknowledged that several photographs of a gun found on his cell phone were similar to the "type of gun" that had been stolen from Henderson. However, Ingram insisted that he did not steal Henderson's gun, but "went and bought it" from someone else the day after it was stolen. Ingram also testified that he did not bring a gun to the meeting with Brown and that he only knew about the gun hidden at the Edgewood Apartments because someone else had hidden it there at his suggestion. Ingram testified that when he left the Veteran's Home after the drug transaction on the night of September 12, Brown was still alive. As for the conflicting statements Ingram gave to Detective Butch during his September 17 interview, Ingram stated that he did not remember participating in that interview or writing any of his written

---

[11] No blood or other evidence of significance was found on the gun recovered at the Edgewood Apartments.

statement. Ingram insisted he was telling the truth at trial and that "all the other statements [were] lies."

1. On appeal, Ingram contends that his trial counsel provided ineffective assistance by failing to: (a) object to irrelevant and prejudicial good character evidence of the victim; (b) object to and redact the portion of Ingram's recorded statement to law enforcement in which he mentioned his juvenile criminal history; and (c) object to the prosecutor calling Ingram's first-offender sentence a "conviction" when a copy of the sentence was tendered and admitted into evidence. We will address each contention in turn, applying the constitutional standard set forth in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

"In order to prevail on a claim of ineffective assistance of counsel," Ingram "must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to [his] defense." *Taylor v. State*, 312 Ga. 1, 15 (6) (860 SE2d 470) (2021) (citation and punctuation omitted). See also *Strickland*, 466 U. S. at 687 (III). "To prove deficient performance," Ingram "must show

that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Ward v. State*, 313 Ga. 265, 272-273 (4) (869 SE2d 470) (2022) (citation and punctuation omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Taylor*, 312 Ga. at 15-16 (6) (citation and punctuation omitted). See also *Robinson v. State*, 278 Ga. 31, 37 (3) (d) (597 SE2d 386) (2004) ("As a general rule, matters of reasonable trial tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel," and "[a] reviewing court evaluates trial counsel's performance from counsel's perspective at the time of trial.") (citations and punctuation omitted). "To prove prejudice," Ingram "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ward*, 313 Ga. at 273 (4) (citation and

17

punctuation omitted).

"An appellant must prove both prongs of the *Strickland* test, and if he fails to prove one prong, it is not incumbent upon this Court to examine the other prong." *Winters v. State*, 305 Ga. 226, 230 (4) (824 SE2d 306) (2019) (citation and punctuation omitted). "In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous." Id. See also *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003) ("We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.") (citation and punctuation omitted).

(a) Ingram first contends that his trial counsel was ineffective for failing to object after two of the State's witnesses placed Brown's good character in issue. We conclude that, even if counsel performed deficiently in this respect, the failure to object to this evidence was not prejudicial. See *Revere v. State*, 302 Ga. 44, 48-49 (2) (a) (805 SE2d 69) (2017).

The record reflects that, during trial, the prosecutor asked Ford

18

— the mother of Brown's children — how she would describe Brown as a person, and she said that Brown was "a good person" and a "good father." Ford further testified that Brown was not "violent" and "would give you literally the shirt off his back." The prosecutor later asked Parks — Brown's girlfriend — how she would describe Brown, and Parks testified, among other things, that Brown was "a very caring person, loved to laugh" and "[w]anted everybody to be happy around him." Parks said Brown was "[v]ery positive," "loved his family, adored his children," and was "just a really nice person, definitely raised right." Ingram's trial counsel did not object to either witness's testimony.

At the motion for new trial hearing, trial counsel testified that he did not object to Ford's testimony because he viewed it "as maybe more harmless or general information" about Brown. And, with regard to Parks's testimony, trial counsel testified that he was "having trouble remembering what was going through [his] mind at the time," but he could not affirmatively state that his decision not to object was not "based on trial strategy." In denying the motion

19

for new trial, the trial court held that Ingram "did not show that his trial counsel was ineffective in failing to object to this evidence," but that "even if [trial counsel] were ineffective in failing to object to this testimony, there is no reasonable probability that but for that defici[en]t performance, the jury would have reached a different result in this case."

The admissibility of the testimony at issue is governed by OCGA § 24-4-404 (a) (2), which provides that

> [e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion, except for . . . evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same; or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor.

In accordance with this statute, "the State may only introduce evidence of a victim's good character to rebut evidence of a pertinent character trait of the victim after the defendant has first introduced such evidence at trial." *Revere*, 302 Ga. at 47 (2) (a) (emphasis omitted). See also OCGA § 24-4-404 (a) (2).

On appeal, Ingram asserts that, when the State elicited the subject testimony from Ford and Parks, Ingram had not yet presented any evidence regarding Brown's character or any evidence to suggest that Brown was the first aggressor. Ingram thus contends that Ford's and Parks's testimony was inadmissible evidence of Brown's good character, and Ingram's trial counsel should have objected to its admission.

Even assuming, without deciding, that Ingram's contention in this respect was correct and thus assuming that counsel performed deficiently, we conclude that Ingram has not carried his burden of proving prejudice under *Strickland*, 466 U. S. at 687 (III). Again, to prove prejudice, Ingram is required to show that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ward*, 313 Ga. at 273 (4) (citation and punctuation omitted). And "[t]he burden of showing a reasonable probability that the outcome" of Ingram's trial would have been different, "though not impossible to carry, is a heavy one." *Revere*, 302 Ga. at 49 (2) (a) (citation and punctuation omitted).

21

The evidence of Ingram's guilt in this case was strong. During Ingram's custodial interview with Detective Butch, he told Detective Butch that, on the night of September 12, 2019, he met Brown at the Veteran's Home to conduct a drug transaction and that he shot and killed Brown when Brown pointed a gun at him and tried to rob him. Ingram also stated in this interview that, after the shooting, he stopped by Milledgeville Manor to see his sister to tell her that he loved her. Several witnesses, including Ingram's sister, testified at trial that they saw Ingram at Milledgeville Manor on the night of Brown's murder and that he told them he had shot someone and would be going to jail. Ingram also told Detective Butch that, several hours after the shooting, he moved Brown's body down the road from the Veteran's Home and took Brown's cell phone, throwing part of it away along the roadway and part of it away at a gas station. Surveillance footage from the gas station confirmed that Ingram stopped by this location during the early morning hours of September 13 and threw something away. Evidence was also presented to show that Ingram's fingerprint was found on the

passenger side door of Brown's vehicle; that numerous calls were placed between Ingram's cell phone and Brown's cell phone on the night of Brown's shooting — Ingram also acknowledged exchanging text messages with Brown during this timeframe; that a .40-caliber handgun was used to kill Brown — "likely a Smith & Wesson" — and that a .40-caliber Smith & Wesson was recovered by law enforcement at the Edgewood Apartments where Ingram indicated his gun would be located; and that this same weapon was stolen from Henderson in July 2019 during the timeframe when Ingram was residing with him. Ingram also explained to Detective Butch where the cocaine he purchased from Brown could be located, and officers were able to find the cocaine in that location. And Ingram's trial testimony conflicted significantly with what he told Detective Butch during his custodial interview — shifting from an assertion that he shot Brown in self-defense to an assertion that he was not present for the shooting. Nevertheless, Ingram admitted at trial that he met Brown at the Veteran's Home to conduct a drug transaction on the night Brown was shot.

"Considering the totality of the evidence, we find no reasonable probability that, had trial counsel objected to the testimony" that Ingram complains of, the outcome in Ingram's case "would have been different." *Revere*, 302 Ga. at 49 (2) (a). See also *Strickland*, 466 U. S. at 695 (III) (B) (holding that "[i]n making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury"). We thus conclude that Ingram failed to show prejudice under *Strickland*, and this ineffective assistance of counsel claim fails.

(b) Ingram next contends that his trial counsel was ineffective for failing to object to the admission of Ingram's September 13 recorded interview with law enforcement where Ingram mentioned his juvenile criminal history and for failing to ensure that this part of the interview was redacted at trial. During Ingram's September 13 interview with Detective Butch, Ingram briefly discussed his juvenile record and that he had been accused of a delinquent act involving a firearm after "a guy" accused Ingram of "pull[ing] a gun on" him. At trial, this interview was played for the jury in its

24

entirety, including this brief reference to Ingram's juvenile delinquency history, and Ingram's trial counsel did not object.

At the motion for new trial hearing, Ingram's trial counsel testified that Ingram's juvenile record was one of the things that he was trying to keep out. Trial counsel explained that it was a "mistake" that this evidence was admitted, and he had no strategic reason for it to come in at trial. Trial counsel further testified that when Ingram's interview was played for the jury and he heard Ingram mention his juvenile history, he did not object because he did not want to draw more attention to the statement.

In denying Ingram's motion for new trial, the trial court determined that Ingram's counsel just "overlooked this portion of [Ingram's] statement," which should have been redacted. The trial court concluded that, while trial counsel's performance in failing to have this portion of the statement redacted was deficient, Ingram was not prejudiced by the inadvertent admission because the evidence against Ingram "was overwhelming, and the admission of this statement did not affect the outcome of this case." We agree.

25

Even assuming "deficient performance in the failure to object or seek redaction" of Ingram's statement during his September 13 interview, *Phillips v. State*, 285 Ga. 213, 219 (5) (a) (675 SE2d 1) (2009), Ingram has not shown a reasonable probability that the outcome of his trial would have been different had that portion of his September 13 interview not been admitted.  See *Grant v. State*, 305 Ga. 170, 175-176 (5) (b) (824 SE2d 255) (2019) (holding that, "[e]ven assuming that trial counsel's failure to seek the redaction of the video [played for the jury] was deficient, there was no prejudice"), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (838 SE2d 808) (2020).  The prejudicial effect of Ingram's juvenile record was minimal, particularly given the passing reference to it in the midst of a custodial interview involving a far more serious crime, and the lack of any details or discussion regarding the delinquent act at trial.  In light of the strong evidence of Ingram's guilt detailed above, we cannot say that Ingram was prejudiced by the admission of this evidence, and Ingram has not shown otherwise.  See *Grant*,

305 Ga. at 176 (4) (b). Thus, Ingram "cannot show ineffective assistance of counsel on this basis." Id.

(c) Ingram also contends that his trial counsel provided ineffective assistance by failing to object to the prosecutor's description of Ingram's first-offender sentence as a "conviction" when the prosecutor tendered and admitted a certified copy of that sentence into evidence. During the prosecutor's direct examination of Detective Butch at trial, the prosecutor asked him whether he was aware that Ingram was on probation when he went to Ingram's apartment on September 13. Detective Butch responded affirmatively, and the prosecutor asked if Ingram was "on a First Offender sentence" for the "offense of burglary." Detective Butch responded, "Yes, sir." The prosecutor then said, "I'm going to show you what's been marked as State's Exhibit No. 20, Your Honor. It's a certified copy of that burglary conviction I'm asking to be entered into evidence." The trial court asked whether Ingram's trial counsel had any objection, and trial counsel responded that he did not. The exhibit was then admitted into evidence.

At the hearing on Ingram's motion for new trial, Ingram's trial counsel testified that he did not recall hearing Ingram's first-offender sentence referred to as a "conviction" at trial, but he should have objected to such a classification. And, in denying Ingram's motion for new trial, the trial court concluded that, even assuming trial counsel performed deficiently in failing to object to the use of the word "conviction" by the prosecutor, "there [was] absolutely no showing" that this misstatement "prejudiced [Ingram] in any way," particularly since the prosecutor properly classified the sentence as a first-offender sentence when questioning Detective Butch about it at trial. The trial court further noted that the jury had a certified copy of the sentence available to it during deliberations, which was clearly marked as a first-offender sentence, not a conviction.

We similarly conclude that, even if trial counsel was deficient in failing to object to the prosecutor's characterization of Ingram's first-offender sentence as a "conviction" while tendering that sentence into evidence, there was no prejudice. Given the other evidence presented against Ingram at trial, the fact that the

28

prosecutor properly classified Ingram's first-offender sentence when questioning Detective Butch about it at trial, and the fact that the jury had access to a certified copy of the first-offender sentence during its deliberations, Ingram has not demonstrated a reasonable probability that the outcome of his trial would have been different had his trial counsel objected to the use of the word "conviction" at trial. Therefore, this enumeration of error fails.

2. In Ingram's final contention, he asserts that, because the evidence presented against him at trial was "largely circumstantial and certainly not overwhelming," the cumulative effect of trial counsel's deficient performance "contributed at least within a reasonable probability to the guilty verdicts" and resulted in prejudice to Ingram that entitles him to a new trial. We see no merit to this contention.

While we have assumed that Ingram's trial counsel performed deficiently in (1) allowing good character evidence of Brown to be admitted at trial, (2) allowing Ingram's statements about his juvenile record into evidence, and (3) failing to object to Ingram's

29

first-offender sentence being classified as a "conviction," these cumulative errors of trial counsel will not entitle Ingram to a new trial unless "actual prejudice resulted." *Schofield v. Holsey*, 281 Ga. 809, 811 (II) (642 SE2d 56) (2007) (holding that "[t]o prevail on his claims," the appellant "must show that his trial counsel rendered constitutionally-deficient performance and that actual prejudice resulted"), overruled in part on other grounds by *Lane*, 308 Ga. at 23. "In order to find actual prejudice, this Court must conclude that there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 811-812 (II) (citation, punctuation and footnote omitted). As we have already concluded above, the evidence presented against Ingram at trial was substantial, and Ingram has failed to show that, absent "his trial counsel's alleged deficiencies," there is a "reasonable probability" that the outcome of his trial would have been different. Id. at 812 (II). Accordingly, Ingram "has failed to show prejudice [from the combined effect of trial counsel's

errors] sufficient to sustain his ineffective assistance of counsel claim[s]" or that the combined effect thereof constituted reversible error, and this final enumeration of error fails.  Id. at 816 (II).

*Judgment affirmed.  All the Justices concur.*

Decided May 2, 2023.

Murder. Baldwin Superior Court. Before Judge Trammell.

*David J. Walker*, for appellant.

*T. Wright Barksdale III, District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.

31