NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 7, 2023

S23A0846.  COOPER v. THE STATE.

MCMILLIAN, Justice.

In September 2021, a jury found Kiresa Cooper guilty of malice murder, feticide, and other related crimes in connection with the shooting death of Auriel Briana Callaway, who was pregnant at the time she died.[1]  On appeal, Cooper asserts: (1) that the evidence was

---

[1] Callaway and her unborn child were killed on July 22, 2019, and on October 22, 2019, an Athens-Clarke County grand jury indicted Cooper for malice murder (Count 1), felony murder predicated on aggravated assault with a deadly weapon (Count 2), three counts of aggravated assault with a deadly weapon (Counts 3, 5, and 6), feticide (Count 4), and four counts of possession of a firearm during the commission of a crime (Counts 7-10).  Following a trial from September 13 through 17, 2021, a jury found Cooper guilty of malice murder, felony murder, one count of aggravated assault with a deadly weapon, feticide, and two counts of possession of a firearm during the commission of a crime; the jury found her not guilty of the remaining charges.  The trial court sentenced Cooper to two consecutive sentences of life in prison for malice murder and feticide, plus two consecutive sentences of five years in prison for her possession of a firearm during the commission of a crime convictions; the felony murder count was vacated by operation of law and the aggravated assault count for which Cooper was found guilty was merged for sentencing purposes.

insufficient to support her malice murder conviction; and (2) that her trial counsel rendered ineffective assistance by failing to object to twenty portions of the lead detective's testimony on various grounds, such as inadmissible hearsay, confrontation violations, improper opinion and speculation, and failure to properly authenticate evidence. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed that on the afternoon of July 22, 2019, a group of teenage girls were fighting at the apartment complex where Callaway lived. Police arrived and broke up the fight, but after the police left, people exited their apartments, forming a crowd that spread out around the apartment complex. At least two distinct groups of people formed; one of which included Cooper and some of her family members, and the other which included Callaway and

Cooper timely filed a motion for new trial on September 30, 2021, which was amended by new counsel on July 29 and again on October 3, 2022. Following a hearing on November 2, 2022, the trial court denied Cooper's motion for new trial on March 1, 2023. Cooper filed a timely notice of appeal on March 23, 2023, and the case was docketed to the August 2023 term and thereafter submitted for a decision on the briefs.

members of another family named Calhoun. Certain people within each group, including Cooper but not including Callaway, began yelling and threatening each other. Finally, gunfire rang out, and as people scattered, Callaway was struck once in the torso by a 9mm bullet, causing her death and that of her unborn child.

Multiple eyewitnesses who were among the people at the apartment complex on the night of the shooting testified at trial. Felicia Calhoun testified that she arrived at the apartment complex after the initial fighting but before the shooting because she received a call informing her that one of her daughters was involved in the fight. As Calhoun stood outside with her daughters and others, including Callaway, a group of people came from one of the apartment buildings "yelling and cussing." That group included Cooper, who shouted "I'll shoot all of y'all," "I will kill all you b***hes," and "I'll shoot everybody," as she walked toward them. Calhoun testified that she then saw Cooper begin shooting and that Cooper was "aiming at us."

According to Brittny Mason, she came to the apartment

complex to visit her cousin that day, and when she arrived, the police were still there and "[e]verybody was rowdy," but the police left a short time after she arrived. After the police left, "everybody went outside," including Cooper, who was holding a handgun and saying she "didn't come to fight," she "came to shoot." Mason and others told Cooper to put the gun away, but, according to Mason, "[s]he told us that she grown, don't tell her what to f**king do." Cooper also said, "Y'all got guns, then we got guns, too." Mason testified that she made a phone call, and while she was on the phone, she heard gunshots and then, again, saw Cooper holding the gun, though she did not see her shooting. Mason also acknowledged at trial, however, that she previously told investigators that she saw Cooper fire her gun, though she did not see where Cooper was aiming. According to Mason's trial testimony, she heard multiple shots but did not see who fired first or where the shots came from.

Ivy Dunn, who resided at the apartment complex, testified that on the day of the shooting, she witnessed some earlier fights between "the Cooper girls and some more people." After the fights, Dunn saw

4

Cooper and members of her family come back outside, and Cooper told the other crowd of people who were also gathered outside, "When I shoot, I'm going to aim. Ain't nobody fixing to f**k with my family members," before she "stood in the middle of the road and she started shooting . . . towards up the crowd – where the other crowd was." Dunn testified that she "seen it plain as day" and that "the first shot came from Ms. Cooper." Dunn did not witness anyone threaten Cooper before she began shooting.

Another witness, Jocelyn Wheeler, who was visiting Callaway, was with Callaway when she was shot. Wheeler testified that once the shooting began, "[i]t just went haywire," and they began to flee but Callaway fell, and "I felt like they was trying to kill all of us that was over there," so Wheeler pulled out her own gun and "fired back at where I seen sparks was coming from," where she saw a girl with "red hair, red braids or something."[2] According to Wheeler, other people started firing as well, and she believed that as many as 100

---

[2] Photographs extracted from Cooper's phone that were admitted into evidence showed Cooper with red-colored braids days before the shooting.

shots were fired.

Another resident, Shandra Goolsby, testified that before the shooting, she saw Cooper standing outside with members of her family, yelling and holding a gun. Goolsby heard gunfire which she believed was pointed into the air to clear the crowd of people who were gathering outside, and she then heard another person, Jasmine Taylor, whom Goolsby did not believe was holding any gun, shout, "Y'all b***hes shooting in the air. We're aiming." Goolsby was not sure what, if anything, Cooper may have yelled. At that point, gunfire began erupting. Although Goolsby saw Cooper "walking back and forth with her gun," she did not see Cooper aiming the gun. Seconds after the shooting, however, Goolsby saw Cooper coming around the side of Goolsby's building, holding her gun, and Cooper appeared to have "a smirk on her face." Goolsby came outside as the police were there collecting evidence, and when she returned to her apartment, Cooper was there and told her that she fired her gun between two buildings. Approximately 30 minutes later, Callaway's sister arrived at Goolsby's apartment, at which

6

time, Cooper claimed that she did not fire her gun, despite being challenged with her earlier statement that she had, but Cooper kept saying, "I didn't kill your sister. I didn't kill your sister."

Callaway was transported to the hospital, where she and her unborn child were pronounced dead. Callaway's autopsy showed that her cause of death was a single gunshot through the chest. The 9mm bullet that killed her was retrieved from her body.

Based on multiple witness statements during law enforcement's investigation of the shooting, police obtained and executed a search warrant for Cooper's apartment, where they recovered a KelTec gun box with documents bearing Cooper's name and the serial number of a KelTec 9mm handgun. Cooper's mother, Barbara Patman, also consented to a search of her vehicle, which Cooper also used and where police recovered a backpack containing ammunition of various different calibers, including 9mm, and a magazine, though no evidence was introduced at trial tying any of these items specifically to Cooper's gun or to the bullet that killed Callaway. Investigators also recovered over 80 spent shell casings

from the scene, including 9mm casings. Based on the information they had gathered, investigators obtained an arrest warrant for Cooper, and she was arrested two days later in Smyrna and transported to the Athens-Clarke County Jail. After Cooper's arrest, Patman came to the jail with Cooper's loaded 9mm KelTec gun "to get her name cleared."[3] According to Patman, Cooper told her that on the day of the shooting, she came out to protect her cousins who were involved in the initial fighting, and Cooper admitted to her that she fired shots but denied shooting Callaway.

A forensic firearms examiner testified that he performed analysis on Cooper's gun and the bullet recovered from Callaway's body, as well as some of the shell casings recovered from the crime scene, and that it was his expert opinion that the bullet and some of the shell casings were fired from Cooper's gun. Another law enforcement officer testified that she was able to extract information

---

[3] It was stipulated at trial that Cooper owned the 9mm KelTec handgun. No evidence was introduced at trial tying the ammunition that was in the gun when it was turned over by Patman to the bullet recovered from Callaway's body.

from Cooper's cell phone, which was given to the lead investigator, Athens-Clarke County Police Detective Scott Black.

Detective Black testified as one of the State's final witnesses before it rested. Detective Black explained, as part of his initial summary of the investigation, that after police had conducted several interviews, "[t]he name Kiresa Cooper kept being brought up more and more," and "[s]everal witnesses actually identified Ms. Cooper out of a lineup as seeing her. Several witnesses stated that they saw her with a gun," and "[t]here were witnesses who stated that they saw her shoot the gun in the direction of [Callaway]." Detective Black explained that some of these witnesses had already testified at trial and that "there was just a plethora of evidence that just kind of kept pointing [to] Kiresa Cooper which gave us probable cause to believe that she was in fact the person responsible for this."

Describing the findings of the investigation in more detail, Detective Black recounted that the events had started with the earlier fighting between groups of girls at the apartment complex, whom he referred to as the "Calhoun group," who had gathered in

9

the parking area toward "the top of the complex" near building 160, and "the Cooper group." Detective Black explained that based on law enforcement's investigation, the initial shot came from the area where the Calhoun group was gathered and was a shot in the air, "likely a crowd-clearing shot or a warning shot," but that it prompted Cooper to start yelling, "So you b***hes got guns. We got guns, too. When I shoot, I aim." A "short volley of fire" then rang out, and it was during that volley of shots that Callaway was struck and killed. Detective Black further explained that based on the shell casings recovered from the scene, it appeared that multiple shots were fired from the area where the Calhoun group was gathered but that the lack of property damage to any building, window, or vehicle, made it appear that those shots had been fired in the air. Detective Black also noted that there were not any witnesses who said that someone was shooting at Cooper or that Callaway ever possessed a gun.

A portion of the initial fighting was recorded by Mason and provided to law enforcement. That recording was played for the jury

10

during Detective Black's direct examination. According to Detective Black, the video showed Cooper with "very long kind of reddish or burgundy braids that kind of made her a little easier to find in the crowd," and she appeared to be "apparently fine with the fight . . . allow[ing the girls] to fight and . . . trying to just make sure no one else jumped in." Detective Black also testified about photographs extracted from Cooper's phone, showing that she had long, red-colored braids in the days before the shooting; these photographs were also shown to the jury. By the time Cooper was arrested two days after the shooting, she had altered her appearance and no longer had long red braids. Detective Black also testified regarding text messages that were recovered from Cooper's phone. Screenshots of the text messages were introduced into evidence. Detective Black noted that those messages indicated that Cooper was afraid of being arrested after the shooting and that she denied being the one who shot Callaway, but when asked, Detective Black testified that he saw nothing in any of her texts after the shooting "expressing any kind of sadness" about it.

11

Cooper called two witnesses in her defense, Cassandra Smith and Saquia Davenport, and Cooper testified in her own defense. Smith testified that she was at the apartment complex on the night of the shooting and standing near Callaway with the group of people that was gathered near building 160. Smith recalled that she first heard two shots come from the area near building 160, followed by "a shot or two [] from the other direction," which was the time when Callaway was shot, "and then a couple seconds later, a lot of shots came . . . [from] all directions." Davenport, who is Cooper's cousin, testified that her daughters were also involved in the earlier fighting and that she and Cooper went to break up the fight. When police also arrived to break up the fight, Cooper asked them to stay because there were "a lot of people at the top [of the hill near building 160] yelling down at us," but the police left. According to Davenport, after the police left, the first shots came from the top of the hill near building 160, and she then saw Cooper firing.

Cooper testified that after learning of the initial fighting, she arrived to separate Davenport's children from the "Calhoun kids."

Cooper said that after police arrived and broke up the fight, she "was begging them to stay in the neighborhood because I knew if they leave, it was going to get worser [sic]," but the police left anyway. After the police left, the Calhoun sisters came back out holding bats and yelling at Davenport's daughter, saying "Y'all b***hes need to come on. We'll show y'all how to fight," and Davenport's daughters yelled back, "Oh, y'all b***hes got guns. We got guns too, and if y'all aim, we know how to aim too." Cooper admitted that she had her gun but denied yelling at anyone. Cooper testified that the initial two shots came from near building 160, but she could not tell what direction they were going, and that several shots then started "going off at the same time." Cooper said she was scared of being shot, and she admitted firing her gun two or three times, but said that she fired toward the river and never aimed at anyone. She testified that she knew she did not kill anyone due to the direction in which she fired her gun. She maintained that she was trying to protect herself and her family.

1.    Cooper contends that the evidence was insufficient to

support her malice murder conviction. We disagree.

When this Court evaluates the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted). In this case, multiple eyewitnesses testified that Cooper brandished her gun while yelling belligerent threats toward the group of people where Callaway was located. Both Calhoun and Dunn testified that they observed Cooper aiming toward that group as she shot. Dunn further testified that Cooper fired the first shots. Moreover, Goolsby testified that immediately after the shooting, she saw Cooper holding her gun and smirking. And this was all in addition to Cooper's own admission that she fired her gun during the incident and the ballistics evidence confirming that the bullet that killed Callaway, as well as shell casings recovered from the crime scene, were fired from Cooper's gun.

This evidence was more than constitutionally sufficient for a rational jury to find Cooper guilty beyond a reasonable doubt of malice murder. And this remains true despite Cooper's arguments that the evidence of who fired first and who said what was inconsistent; that she only fired out of fear and not toward any people; and that the firearm examiner testified that he was not permitted to use the terminology "reasonable scientific certainty," in opining that the shell casings and fatal bullet were fired from Cooper's gun, because it is well established that it is for the jury who heard that evidence to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence, as well as whether to accept or reject a defendant's version of events. See *Williams v. State*, 316 Ga. 147, 151 (1) (2023); see also *McIntyre v. State*, 312 Ga. 531, 531 (1) (863 SE2d 166) (2021) ("This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (citation and punctuation omitted)). Accordingly, this

enumeration of error fails.

2.    Cooper also contends that her trial counsel rendered ineffective assistance by failing to object to multiple portions of Detective Black's testimony.  We are not persuaded.

To succeed on a claim of ineffective assistance of counsel, Cooper must show both that her counsel's performance was deficient and that such deficiency prejudiced her defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).  To satisfy the deficiency prong, Cooper must demonstrate that her counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Bacon v. State*, 316 Ga. 234, 239 (3) (887 SE2d 263) (2023) (citation and punctuation omitted).  In doing so, Cooper must overcome "[a] strong presumption . . . that trial counsel's performance was reasonable and that counsel's decisions and choices at trial fell within the broad range of professional conduct as assessed from counsel's perspective at the time of trial and under the specific circumstances of the case." Id. (citation and punctuation

omitted). To establish prejudice, Cooper "must prove that there is a reasonable probability that, but for [her] trial counsel's deficiency, the result of the trial would have been different." *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022). And if Cooper fails to make a sufficient showing on either the deficiency or the prejudice prong, we need not address the other prong. See *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022).

In all, Cooper lists the following 20 portions of Detective Black's testimony, which she asserts—without further argument or citation to any case law—were objectionable because they constituted inadmissible hearsay that served to bolster his investigation and that violated her confrontation rights[4]; because they constituted improper speculation or opinion, including opinion on the ultimate legal issue in the case; or because they were not based on Detective Black's personal knowledge:

1) Detective Black's preface of his description of the police

---

[4] Cooper does not indicate in her brief whether she is referring to her right to confrontation under the Sixth Amendment to the federal Constitution, the comparable right under the Georgia Constitution, or both.

investigation that "[a] lot of times it's not uncommon for folks involved in situations like this to not want to be involved or want to be witnesses or go to court. In certain areas of the county that is kind of even more difficult."

2) Detective Black's response in the negative when asked by the prosecutor if it was "surprising" to him that some witnesses did not want to be involved and that so many shell casings were discovered.

3) Detective Black's testimony that during witness interviews, Cooper's name came up "more and more" that "[s]everal witnesses stated that they saw [Cooper] with a gun"; that "witnesses stated that they saw her shoot the gun in the direction of [Callaway]"; and that "[t]here was just a plethora of evidence . . . pointing [to Cooper]."

4) Detective Black's testimony that Cooper was "in the wind . . . . She seemed to have kind of disappeared or fled the area most likely."

5) Detective Black's description, in response to a question from

the prosecutor about evidence that was "significant," of the gun box and backpack with ammunition that were found during the searches for which he was not present.

6) Detective Black's testimony that unnamed witnesses had said they saw Cooper in possession of a gun "while shooting."

7) Detective Black's response, when asked by the prosecutor, that he had taken the legal defenses of justification and self-defense into consideration during the investigation.

8) Detective Black's description of the groups involved as the "Calhoun group" and the "Cooper group."

9) Detective Black's testimony that he did not think Callaway was a part of either group.

10) Detective Black repeating Goolsby's testimony that the initial gunfire sounded like a warning shot, which was not uncommon.

11) Detective Black's testimony that none of the investigation indicated that anybody was firing at Cooper or that Callaway ever possessed a gun.

12) Detective Black's testimony about the alleged "crowd-clearing shot" that "[m]ost people were describing as likely that they just know it's in the air, and it's kind of trying to get rid of the crowd."

13) Detective Black's testimony that "witnesses and the general investigation shows [Cooper] then starts yelling . . . 'you b***hes got guns.  We got guns, too . . . When I shoot, I aim,' which seems to be a reference to 'Well, I'm not shooting warning shots.'"

14) Detective Black being used by the State to lay the foundation to introduce into evidence the video of the fighting, taken and provided by Mason, that supposedly sparked the ensuing events, despite his lack of personal knowledge to authenticate that evidence.

15) Detective Black's testimony while discussing the video and selected screenshots for the jury that they depicted Cooper, whom he could identify based on her hair color and witnesses' description of the shooter as having red braids.

16) Detective Black's testimony that nowhere in Cooper's text messages did she express any sadness for Callaway.

17) Detective Black's testimony on cross-examination that the video appeared to show Cooper encouraging the other girls to fight.

18) Detective Black being used by the State to lay the foundation to introduce into evidence the magazine and ammunition taken from Cooper's gun, despite his lack of personal knowledge to authenticate that evidence.

19) Detective Black's testimony that shooting into a crowd that included children was neither reasonable nor justified.

20) Detective Black's testimony that Callaway was "completely innocent [and] one of the few true victims" he had encountered in his career and that "[y]ou can't just shoot into a crowd . . . and expect to be able to do that with impunity."

As an initial matter, many of these portions of Detective Black's testimony simply did not violate Georgia's rules of evidence. As for alleged deficiency numbers 1 and 16 (failure to object to

21

testimony that some people were resistant to talking to police about crimes they had witnessed and that none of Cooper's texts expressed sadness for Callaway), this was not impermissible opinion testimony, as Cooper argues, but rather, was no more than straightforward factual testimony regarding matters within Detective Black's personal knowledge, which is admissible. See OCGA § 24-6-602; see also *Draughn v. State*, 311 Ga. 378, 385 (4) (858 SE2d 8) (2021).

As for alleged deficiency numbers 2, 5, and 17 (failure to object to Detective Black's responses that it did not surprise him that so many shell casings were recovered or that some people were resistant to talking to the police; his responses concerning what evidence he found significant; and the cross-examination exchange in which he testified that the fight video appeared to show Cooper encouraging the girls to fight), Detective Black's testimony was permissible as non-expert opinion testimony that was "[r]ationally based on the perception of the witness" and "[n]ot based on scientific, technical, or other specialized knowledge within the scope of Code

22

Section 24-7-702 [expert testimony and qualifications]." OCGA § 24-7-701 (a) (1), (3); see also *Harris v. State*, 309 Ga. 599, 604-05 (2) (a) (847 SE2d 563) (2020).

And as for alleged deficiency number 14 (failure to object to Detective Black's authentication of the fight video recorded by Mason), the rules of evidence do not provide that a video recording can be authenticated solely by the person who recorded it or who was an eyewitness to the events depicted therein. It appears that Detective Black properly authenticated the video by testifying that he responded to the apartment complex as part of his investigation, where he personally observed the location and spoke with multiple eyewitnesses of the day's events; that he recognized the video as the recording supplied by Mason—who was also available and testified at trial—during his investigation; that he had personally reviewed the video; that it showed part of the fighting that occurred at the apartment complex, as he recognized some of the persons depicted in the video, including Cooper, as well as the location it depicted;

23

and that he had not altered the video.[5]  See § OCGA 24-9-901 (a)-(b) (1), (4) ("The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims[, which includes, for example,] [t]estimony of a witness with knowledge that a matter is what it is claimed to be; [or] [a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"); see also *United States v. Broomfield*, 591 F. App'x 847, 851-52 (11th Cir. 2014) (video recording that government did not make of defendant in possession of firearm was amply authenticated where government's evidence "identified the individual in the video as [defendant], established where and

---

[5] In addition, because Mason was available to authenticate the video, it was a reasonable strategy to refrain from objecting on grounds that could have been easily cured.  See *Washington v. State*, 313 Ga. 771, 774 (3) (b) (873 SE2d 132) (2022) (holding that defendant failed to show that trial counsel was deficient in failing to object to video recording on the ground that it was not properly authenticated by lead detective and district attorney investigator because "refraining from objecting to foundational matters that can be readily cured," including by another witness who is able to do so, "is not an unreasonable strategy") (citation and punctuation omitted).

approximately when the video was recorded, and then identified the specific rifle and ammunition depicted in the video"). Objections to these portions of Detective Black's testimony (numbers 1, 2, 5, 14, 16, and 17), therefore, would have been meritless, and "the failure to make a meritless objection is not deficient performance." *Smith v. State*, 315 Ga. 357, 367 (5) (b) (882 SE2d 289) (2022).

As to several of Cooper's other claims of ineffectiveness for failure to object, even if those objections would not have been meritless, Cooper has not shown that counsel's failures to object to those portions were objectively unreasonable. These include counsel's failure to object to Detective Black's testimony concerning alleged deficiency numbers 3, 6, 8, 10-13, and 15 (referring to other witnesses' statements about the shooting) because that testimony was cumulative of other properly admitted trial court testimony and evidence. Cooper has not offered any evidence to overcome the strong presumption that counsel's performance fell within the broad range of professional conduct and therefore has not carried her burden of showing that counsel's failure to object to that cumulative

evidence was objectively unreasonable, especially since such objections may draw more attention to inculpatory testimony. See *Sawyer v. State*, 308 Ga. 375, 384 (2) (b) (839 SE2d 582) (2020) (trial counsel not deficient in failing to object to cumulative testimony); *Koonce v. State*, 305 Ga. 671, 676 (2) (d) (827 SE2d 633) (2019) ("Trial counsel was not deficient in failing to object to the cumulative testimony of [the lead detective] on these matters [regarding the results of her investigation]."); see also *Snipes v. State*, 309 Ga. 785, 794 (3) (b) (iv) (848 SE2d 417) (2020) (allegedly objectionable testimony was "largely cumulative of other admissible testimony . . . and therefore [defendant] has failed to show that trial counsel was deficient in failing to object to this testimony or that a reasonable probability exists that the outcome of the trial would have been different if the objection had been made").

As for alleged deficiency numbers 9 and 20 (failure to object to Detective Black's testimony that Callaway was an innocent bystander who was not a part of either group), trial counsel testified at the motion-for-new-trial hearing, "I don't think that is something

26

that would have been looked favorably upon by the jury if I had objected to the victim being characterized as innocent." This rationale was not objectively unreasonable, and "trial counsel's strategic or tactical decisions," including whether to object to testimony, "generally will not form the basis of an ineffective assistance of counsel claim unless they are so patently unreasonable that no competent attorney would have made it under the circumstances at the time." *Davis v. State*, 311 Ga. 225, 231 (3) (857 SE2d 207) (2021) (citation and punctuation omitted)). Accordingly, Cooper has not carried her burden of demonstrating that her trial counsel acted deficiently in not objecting to Detective Black's testimony as to numbers 1-3, 5, 6, 8-17, or 20.

That leaves Cooper's claims that her trial counsel rendered ineffective assistance by failing to object to Detective Black's testimony that Cooper identifies in numbers 4 (that Cooper had probably fled); 7 (that he had considered justification defenses); 18 (authentication of a magazine and ammunition that came from Cooper's gun); and 19 (that shooting into a crowd with children was

27

not reasonable or justified).  Pretermitting whether this testimony was objectionable and whether any failure to object to this testimony was deficient, Cooper has not established that she was prejudiced by those deficiencies—even considering their cumulative effect, see *Ingram v. State*, 316 Ga. 196, 208 (2) (887 SE2d 269) (2023).  The jury was well aware that Detective Black was not an eyewitness to the crimes upon which he was commenting, such that Cooper's remaining claims of ineffectiveness for failing to object to these portions of his testimony go to more tangential issues versus the substantial evidence of her guilt that the jury had already heard.  That evidence included multiple eyewitnesses to the crimes who testified to Cooper's belligerence and intentionality in firing into the crowd of people, as well as the ballistics evidence that tied Cooper's gun directly to the bullet that killed Callaway and to shell casings recovered from the crime scene, unlike the ammunition authenticated by Detective Black, which was not directly linked to the shooting.  We cannot say Cooper has carried her burden of establishing a reasonable probability that but for counsel's failure to

object to the remaining portions of Detective Black's testimony, the result of her trial would have been different. See *Ingram*, 316 Ga. at 208 (2) (cumulative effect of multiple assumed deficiencies on the part of trial counsel did not actually prejudice defendant where there was substantial evidence of his guilt and he failed to show that absent counsel's alleged deficiencies, there was a reasonable probability of a different outcome); *Bates*, 313 Ga. at 68-69 (2) (d) (assuming without deciding that counsel was deficient in failing to object to a witness's testimony on the ultimate issue of the case, defendant failed to carry his burden to show prejudice given the overwhelming evidence of his guilt). Accordingly, this enumeration of error also fails.

*Judgment affirmed. All the Justices concur.*